Good morning. May it please the Court, I'm Lowell Sturgill from the Department of Justice representing the federal defendants. Who are you representing besides the Department of Justice? Are you representing all of the federal agencies? Yes, Your Honor. Who will be speaking for the State of California? So the plaintiff states in this case lack standing here. They filed in the wrong venue and they're not otherwise entitled to a preliminary injunction, much less the vastly overbroad one the district court gave them. I don't think you have a case directly in point on your venue argument, do you? I'm sorry, Your Honor, on which argument? Your venue argument that a state can only file in the state capitol. We don't, but we think the plain language of the statute. I understand your argument from the language of the statute, principle place of business. But as I recall, there is no case that says that a state must or that a state need not file in the state capitol. So one case I would point you to, one is the In re Big Commerce case from the Federal Circuit. That case held with respect to a different statute that used the same language as this statute. The the, the word the means only one place. So where the, if they, the Well, that presumes, though, that a state government has a principle place of business. It seems to me that the procedural statutes use the term entity, but they separately in various sections use the term state. Why do you equate those? So for the purposes of the specific provision that's at issue here, the, that provision does not use both the term states and entity. No, but we, we're supposed to look at the context of a statute as well as the statute in isolation. And the, the various procedural statutes, the only time they require that a case involving a state be brought in a particular district is when there's land at issue in that specific district. So doesn't that suggest that when the state is involved in litigation, but not about particular land, that, that specific provision doesn't apply? Well, respectfully, no, Your Honor. We think the plain language, you have to start with the plain language of any statute. And we think you don't need to go beyond that here, because, again, the plain language of the statute controls. It's clear that in terms of the definition of what, where a plaintiff's residence is, the statute says, refers to an entity that can sue or be sued, right? So the State can sue or be sued. It is an entity. And there's nothing that suggests that the State is exempt from that definition. Actually, my, my problem with it is a little different from the entity. Where my problem is principal place of business, because states act all over the state. And it's even, even if you consider the capital, it's designated center of business. In a lot of states, well, like my state, they do a little bit in Juneau, but most of the agency personnel, most of the decisions and frequently special meetings of the governor. And I think we've also had special legislative sessions in Anchorage, even though it's not the capital. And it seems like states act all over the state. I don't know how to decide what principal place of business means in the context of a state government. So two points. First of all, the word principal, I think, is important. We don't deny that the states have business throughout their borders. The question is, what is their principal place of business? And other, I don't really know if they have one. So there are no decisions from this circuit on that issue. I know it's easy with a corporation. It's incorporated in Delaware and it has its corporate headquarters in Chicago. I know the two places, but I don't know for state government. That's what I'm asking for help with. I think it's pretty state government is where the governor's offices, where the legislature is, where most of the business is done. That's the principal place of business. Just because some business is done somewhere else doesn't make that any less principal. So you want us to file all the cases for California in the Eastern District. Is that correct? When the plaintiff was, when the state relies on this provision, which applies to plaintiffs. Well, there are some problems that maybe of which you're not aware, and that is the Eastern District backlog because they build all the prisons over there in that district. And what you're asking us to do is to add to that, to have everything that the California is involved in to fall in the Eastern District. And I just wonder why. I would think, I live in San Diego, I think California could sue me in San Diego and not be prejudiced. Is there something that equates the California state as a corporation that we have to fall of that rule? So we're relying on the plain language of the statute, but the statute also allows for the file and venue in other places other than principal place of business. For other instances, for example, where you can, they can sue where a defendant would be subject to personal jurisdiction or where most of the acts occurred. I'm thinking. They haven't relied on those provisions here. So those are significant, I think, answers to your question of how they could pursue actions in other districts and other contexts. I'm thinking this could cause terrible injustice if we went with your position on venue. In a large state like California, I suppose, or my state, Alaska, the expense, the burden and the difficulty of persuading all the witnesses to go to Juneau, a one or two day trip from Juneau, and find rooms in the hotels that are usually too crowded. You're saying if the state of Alaska sues somebody for some sort of penalty or tax or violation of a regulation or something, and the person is in Kwethluk, he has to go to Juneau to defend himself. Well, conceivably, there can always be some situation where to follow the plain language would make the provision absurd. I don't think that applies here. That isn't absurd. The plaintiffs certainly haven't suggested that. There's nothing illogical about it, and the state attorney general's office would love it because no one would be able to defend themselves unless they just happen to be Juneauites. Again, I think that has nothing to do with this case and what's going on here. The plaintiffs haven't suggested that. We're not in Alaska. We're in California. But, sir, what you're urging is the rule compels it. You're urging a rule of law that would apply throughout the circuit. Did you want to move on? You're well over half your time. Are there other issues you want to raise? Yes. Thank you, Your Honor. With respect to standing, it's clear the rules, these rules don't apply to government employers at all. As a result, the States here are left to assert standing based on assumptions about the choices of third parties, private employers and their employees. Well, that's so far as standing relates to facts, the agency itself, the preamble says that they expect, you know, many, many millions of dollars that went from 70 million down to 63 million, but a lot of millions of dollars would be transferred to the States. So in a sense, hasn't the factual component of standing been conceded in the very document that is being reviewed here? So, no, Your Honor. I would point the Court to page 47816 of 82 Federal Register. That's the Religious IFR. And what that shows is the government's numbers there did not account for a number of contingencies that we've laid out in our brief. Specifically, there's a group of contingencies that relate to alternative — whether the women would have alternative access to contraceptive care either through a spouse's plan or a husband's or — Well, that would affect some of it, but basically my problem with your argument is that you yourselves, you, the agencies, estimated that millions of dollars would be spent by States, that the State program would have to pick up some of these costs because they have, you know, robust programs for helping women who need subsidized contraceptive costs. And there are sort of, albeit not very detailed, but there are supporting affidavits on the fiscal impact. Why isn't that enough? Right, because, again, it's important to look at what the IFR said about this issue. What they said, first of all, is that the government lacked the data to be able to make any kind of a concrete judgment or estimate about what these costs would be. It did the best it could with the data it had, but the IFRs are very clear that these information that I'm telling you about, they also lack — But it doesn't have to be precise. If there's a fiscal impact, it doesn't matter whether it's $50,000 or $500,000, does it? No, it doesn't. But, again, if you go through the, as I've done, the levels of speculation that's standing that they can't show with respect to standing, you can't — the IFRs were unable to make any kind of a concrete judgment. For example, another example of what they were missing is information about whether women would share the views of their employers and also, excuse me, whether the woman would want contraceptive forms that her employer objects to. A lot of these employers only object to a small number of the FDA-approved forms. So if a woman was able to obtain her contraception because she was able to get this from an employer, the employer only objected to some other form, then that would, again, be a case where a woman was not denied contraceptive coverage. So again, I think, you know, there are three categories of contingencies here. One is, you know, does — they have to identify an employer who chooses the exception rather than the accommodation and was providing contraceptives prior to the IFRs. The second category is what the woman believes and wants, right? Does she share her employer's beliefs, in which case she wouldn't lose contraception, she wouldn't seek it? Or second, does she want contraceptive forms that her employer would be able to provide? Beyond this, we think, again, the declarations that the State provides are completely also standing here, and I've just about run out of my time. I'd like to save the rest for rebuttal. Well, if we could get you offstanding for a minute, and you can dock this on my time because it's something very important to me, and I don't think it's a sin to go over time on this. And I want to take you to a different position having to do with the nationwide injunction. The Seventh Circuit disagrees with this nationwide on the basis — and the Supreme Court has also said that if we have nationwide injunctions, we don't get the benefit of many courts of appeal, and it interferes with how the Supreme Court can do — and that's true. The Supreme Court relies — likes to have circuit courts disagree because it gives them a better opportunity to come up with the right decision. This invalidates that, and, of course, I don't think there's any law that says the district court can't. But the district court didn't indicate why, in this instance, we shouldn't give further consideration to that. So that's the first point, and let me roll on, and then you can answer the entire one. The other difficulty is — that comes into this case is we have pointed out very carefully in our court decisions that staying and then coming up to get a decision from us isn't going to help too much in the final episode. That is, we have a different standard of view in a permanent injunction. It comes up with testimony instead of just written issues. And so we have pointed out that there's no big reason to come up here and get a permanent injunction. We've tried to indicate that in seven cases in our court. So what is the problem that we have now? Well, the now problem is that as soon as you got the independent — as soon as you got the temporary injunction, you came in and requested a termination of anything going towards the trial. Ten and a half months ago, you and your co-winners had the district court stop everything pertaining to a trial. We've indicated in case after case that the party should continue to prepare for the trial. We've lost ten and a half months coming to a conclusion because the district court allowed that stipulation to occur. Now, it strikes me that this is of significance to this statewide issue. What we have said in the district court is no court in the United States can vindicate a First Amendment right that a person has any place in the United States until we do it here. But there has to be this balance of equities. And I think the balance of equities — I happen to agree with the initial decision. I think that the court had a right to do that. But something happened when you stopped preparation for trial. The balance of equities meant for a year no individual in the United States can vindicate their First Amendment right. And it strikes me that this is wrong. And before, I wanted to make sure that you got the full argument because I don't have a problem at all until you stop. And then it seems to me we have to consider in balancing the equities that for perhaps a year or a year and a half we're going to tell everybody in the United States you can't vindicate your First Amendment right. So I think we agree with you, Your Honor. And our principal good cause argument is that the agencies had good cause to issue these IFRs without prior notice and comment in order to protect religious conscience that was not being protected prior to the IFRs. There were several nonprofit employees that were not protected by injunctions. And this Court in the Kong v. Scully case talked about how significant it is for the government to be able to provide these accommodations. And in the Kikomura v. Hurley, a case cited in our brief, another court appeal said that RFRA violations provide irreparable harm per se. So there was irreparable harm here. And there is irreparable harm by one court telling every other court in the country that it can't, that can't protect the religious liberties of companies that come before them.  Thank you. May it please the Court. My name is Greg Baylor, and I'm here on behalf of March for Life. The State's contention that the IFRs will eventually cost them some money conceitedly has some facial plausibility, especially if you assume that the starting number, the starting universe of employers that are going to invoke the exemptions available in the IFR is really big. And that's because, of course, if you start with a big enough number and you go through the incredibly long chain of causation, nine or ten steps in it, and you're losing big chunks of that big number at every step of the way, the theory is you're still going to end up with somebody at the end. I think there's even a couple of reasons why someone might come to the mistaken conclusion that there are going to be beneficiaries at the end who suffer adverse consequences. One is the scope of the exemption is admittedly broad. And also, as Judge Graber discussed during Mr. Sturgill's time, the Department's numbers, they seem kind of big. In the face of that sort of surface appeal Well, it's more than numbers of dollars. They also made estimates of the number of women whose decisions would be affected. And I believe they said it was up to 120,000 something. That was their estimate, I think. Yeah. And I would like to address that. First of all, it's important to understand what the departments were doing when they came up with those numbers. They were not trying to come up with their best estimate of the number of potentially affected beneficiaries. No, but it's a concession that there would be an effect. And that was my concern. I mean, there was a discussion by Mr. Sturgill that, well, these are only estimates, but standing requires only an estimate. You don't have to say I will lose $9,872.12 if you estimate that you will lose a significant amount of money or have to pay a significant amount of money. But estimates in and of themselves are fine. I can see that. But you have to prove that you're going to incur some costs, and they have not done that. The context, again, of this of these estimates was to essentially run a stress test. Let's imagine every question about the effect on beneficiaries. We're going to resolve in favor of making the number bigger. This is because Executive Order 12866, especially subsection 3F1, requires additional OMB scrutiny of any regulation that has a significant economic impact, which is defined as $100 million. So the departments were answering each question to make the number bigger, just to make sure that they weren't within a million miles of $100 million. And that's why those numbers are bigger than they really ought to be. Counsel, I'd like to actually ask you some questions about the merits of the injunction, since we've basically spent most of the time so far on venue and standing, primarily. What does interim mean to you? Well, an interim final rule is one that has been issued, that it goes into effect, and afterwards the agencies will accept comments and then subsequently issue a final rule. And how long was the interim rule in effect in this case? The interim final rule went into effect on October 6, 2017, and the court, the district court in this case, entered the nationwide preliminary injunction on December 12, so a little over two months. Okay. And I guess my concern, at least with the briefing, was the argument that the second rule basically is available to be used whenever there's a desired policy change and not any emergency and not any timeline in the statute that they're up against or any other problem. And basically the written arguments, at least, seem to read the first sentence out of the Well, of course, the departments have briefed these issues more than we have. Certainly we didn't brief them at all. But at the same time, Congress did give to the agencies authority to issue interim final rules. There are three specific provisions in each of the three statutes that are affected by the ACA. That's right. And so contextually, doesn't that suggest that the purpose of the interim rule, because  here is that there are three agencies that have to cooperate, and what does one agency do if they can't get another secretary to cooperate? Well, they have the power then to issue an interim rule. But it seems to me that it's intended as a quite limited authority. Well, I would point out in this case that the agencies working together has been a phenomenon since 2010 when the ACA was passed. And they've together issued interim final rules three times. And they were just doing that one more time in this case. So they have the express statutory authority to issue interim final rules. Did we so, I know there were several interim rules, as you say, three, I think, in the last administration and one in this administration. Yes, Your Honor. And our decision said interim rules were okay the first three times? Well, there was only one case that raised the question of whether the interim final rules were legitimate, the Priests for Life case in the D.C. Circuit. And the D.C. Circuit held that the interim final rule that was being discussed in that case, there was good cause, they used the good cause exception to the APA for reasons that are pretty much applicable here. They deferred to the Department's understanding of how necessary it was to issue these rules. But that's the one case. Did it say an interim rule for this purpose was okay? It did. Yes, Your Honor. That's what I was trying to find out. The Priests for Life case. Yes, Your Honor. Assemblyman, let me ask you a different question. Just so I can understand, why was your client interested in staying the trial? I don't believe we participated in that decision, Your Honor. We are intervener defendants. And we were granted intervention shortly before the preliminary injunction was granted.  I don't believe that we were. Let me get back to the... My memory may be wrong, but I don't believe that we were. I understand your concern, though, about the case going on. Yes, Your Honor. Let me get back to something that I was starting to ask here. It strikes me, it may not be in the interest of March for Life, depending on how we go, but I would think it might be in the interest of some of the other opponents of this interim rule. If we were to decide that the state governments who brought this lawsuit did not have standing, they would lose this case, but it would still be possible for individual women or a group of women to take the same position where they claimed that they themselves were denied contraceptives that they should have been able to get under their insurance. So the merits question would be left open. Is that correct? That is correct, and we have no problem with that. Our position is not that nobody has standing. In fact, you know, individual beneficiaries could have standing. That said, there's a little bit of the dog that didn't bark phenomenon here, and this goes to your question about the impact of the IFRs. There have been literally two lawsuits filed by beneficiaries who arguably have standing, unlike the states which don't have standing. And both of those cases have been dismissed because those plaintiffs didn't have standing because their employers weren't poised to terminate coverage. So where are all these hundreds of thousands of women that are challenging the IFRs? They just don't exist. I do have to go back to the Department's estimates, Your Honor, if you don't mind. The most significant reason why those numbers aren't reliable, because they did not account for the protection that all the challenge – almost all of the challengers have from litigation. Vast numbers – and this is on pages 20 and 21 of our opening brief – vast numbers of those who challenged the HHS mandate either have settlement agreements or have preliminary injunctions, which after the issuance of the IFRs became permanent injunctions. So to the extent women are going to lose coverage, it's not due to the IFRs. It's due to the lawsuits. So there's no causal connection between the IFRs and impact on beneficiaries. That's a really important point to understand. The other thing I would like to say, and talking a bit about what the States could have done but didn't do to establish standing, read their First Amendment complaint. California alleges that there are 25 employers in its State, 54,879 employees, and that is the last we heard of them. Virginia and Maryland did the same thing. They identified – they sort of identified and never followed up. Counsel, your time has expired. Thank you, Your Honor. We'll hear from Lawyer No. 3. May it please the Court, Mark Rianzi for the Little Sisters of the Poor. Judge Graber, if I can accept your invitation to stay on the merits as opposed to standing. Let me begin with this point. Compliance with RFRA, a federal civil rights statute enacted by Congress, is good cause for issuing an interim final rule. RFRA, the agency's obligations not to impose burdens on people's religion, is obligatory. It is not – But wouldn't that interpretation basically swallow the notice and comment rule? Because basically what you're saying is if we're right on the merits and our proposed rule is a good rule, then we want it to go into effect right away. But that's always true, isn't it? When Congress passes a new statute and says you must put rules out, you have to comply with that. But yet you also have to comply with notice and comment. It seems to me that there'd be nothing that isn't good cause if your – if your argument is it's great policy and we're doing what Congress told us to do. So I don't think that's correct, Your Honor, that it would be good cause all the time. I think this situation is fairly unique. You've got an existing Federal civil rights statute from Congress which imposes the obligation not to violate religious liberty. So you think the previous rule was unconstitutional or against the congressional statute? Yes, absolutely. And more important than me thinking it, Your Honor, a lot of Federal courts, a lot of Article III courts, a whole stack of them, told the agencies that it would violate RFRA. Now, admittedly, that litigation was still open at the time of the new interim final rule. But the point is this is not the agencies off on their own deciding we have a RFRA problem. This is a lot of Article III courts telling them this violates RFRA. It's injunction upon injunction. And they had an obligation once they realized they violated the law to issue the interim final rule. If you compare RFRA with the Administrative Procedures Act, only one of them has a good cause exemption. In other words, there's nothing in RFRA that tells the agencies, well, you can go on violating people's Federal civil rights under RFRA for a little while if you've got a good enough reason for it. So go through the administrative process and take your time. Nothing in RFRA gives them that good cause exception. Congress wrote the APA precisely so that the APA did have that kind of give. And what the agencies did was the exact right thing to do to balance those two interests. Now, Judge Graber, it's not a situation where this could or would happen all the time. In fact, the situation we have here is really very unique. We had dozens of lawsuits involving hundreds of entities that had multiple Supreme Court orders attached to them. We had — this was the seventh — the seventh opportunity for notice and comment related to the existence and scope of the contraceptive mandate and religious exemptions. The IFR in 2010, the IFR in 2011, the ANPRM in 2012, the NPRM in 2013, the third IFR in 2014, the RFI after Zubik in 2016, and then these IFRs. California and the other states had nothing to say for the first six of those. The idea that suddenly there's some serious harm to the states because they have a real interest in this — Well, the rule is — the rule is different, so their interest may be different. I don't think that's true, Your Honor. The issue — Well, from a standing perspective, that could certainly be true. I would say it is theoretically possible, but not terribly likely. The reason they sat on the sidelines is that states have no valid interest in the existence or scope of a Federal contraceptive mandate. Well, I — I have difficulty saying that because a person didn't sue, you know, if there were five times when their rights were violated and they only chose to say ouch on the sixth one, that somehow we can say that their previous silence means  I have difficulty with that argument. So — so I don't disagree with you if they had the ouch, Your Honor, but — but they can yell ouch all they want, but there's no — there's no concrete interest. But — but the fact that they didn't previously doesn't seem relevant to me, at least. Well, my suggestion is only the fact that they didn't say anything previously is actually a pretty good indication that the injury that they're claiming here, which looks pretty concocted, is in fact pretty concocted. Look, the Trump administration and the Obama administration, in some ways — in some ways, the little sisters, my clients, have been caught in the crossfire between political parties over this issue for an unfortunately long number of years. But here's one thing both the Obama and the Trump administrations agreed on. They both agreed that RFRA compliance constitutes good cause for an IFR. The Obama administration did it in 2014 after the Wheaton College order from the Supreme Court. The Trump administration is doing it now. The D.C. Circuit, to go back to Judge Kleinfeld's question in the Priest for Life case, the D.C. Circuit upheld it in Priest for Life, and I think it should be upheld here. Ultimately, agencies obeying a federal civil rights statute, doing what Congress told them to, is a good thing. Agencies obeying a stack of decisions from Article III courts that say, hey, what you're doing violates someone's federal civil rights, that's a good thing. It would be a bizarre ruling from this court to tell federal agencies, you don't have to worry about a lot of orders from Article III courts. That's not good enough cause. Or the fact that you've concluded in good faith that you're in violation of a federal civil rights statute, that's not good cause. The state says on page 42 of their brief, essentially, don't worry about that stack of decisions because it's not from the Supreme Court. I don't think that's any way to run an agency system or run a government. In other words, most things don't get decided by the Supreme Court. The idea that the agency was free to ignore them, they're free to just keep on doing it, unless and until the Supreme Court gives the final answer, I don't think that's the way the system does or should operate. There's no reason to read Congress's good cause provision that way. Am I correct in understanding that your argument on good cause would have no bearing on, say, some EPA regulation to protect a particular environment or species or something? Here the good cause is limited to where there's at least statutory and possibly constitutional protection under the First Amendment for the activity that would otherwise be impaired. Correct, Your Honor. This is an obligation. The statute says government shall not, right? The government has an obligation not to impose this burden on the Little Sisters and other folks' religious liberty. This is, the state calls it a ubiquitous and unremarkable circumstance. I would suggest to you it's exactly the opposite. It is utterly unique in my career, in my life, and I would suggest in almost anyone else's looking at the federal courts. This doesn't happen every day where it's the seventh time, it's the seventh time we've had notice and comment, the Supreme Court has issued multiple decisions on it, coast-to-coast litigation. It's just not, it's not regular. Let me circle back to standing to make this point, and, Judge Graber, this goes to your point about the language in the Fed's regulation. If you assume that there are employers who are going to take advantage of the rule, which is certainly what the State is going to argue, their argument is premised on the fact that employers will take advantage of it, and their employees, you know, will want something they can't get, and they won't get it from someplace else, and somehow they'll end up on the State rolls. If you assume that there are employers who are going to take advantage of it, then the existence of those employers who are going to take advantage of it confirms that the federal government had good cause. In other words, if those employers really exist, which I think you have to assume to get past standing, then the answer is the federal government had good cause, they had an obligation under an existing statute to remove the burden, and that's what they did. And the agencies had no choice for another reason, which is, after the concessions they made at the Supreme Court in Zubik, and after the concessions that they made in the IFR, they knew they would lose every single RFRA case forever after. They've already admitted that they have lots of other ways to get people contraceptives. And having admitted that, Judge. Let me ask you something about your previous comment. I'd like to ask you a hypothetical question, because I have no idea what the true facts are, and they're not at issue here, not brought up here. Let's suppose that the contraception at issue, and it's just female contraception, it's not condoms or any sort of male contraception. Let's suppose that the contraception is so inexpensive that insurance rates would not vary at all, whether it was covered or not. The main significance would be the administrative effort of having a new policy form or a rider that said whether they're covered, and if the insurance company wanted to expand its market and include religious organizations, it would give them a rider saying contraception is not covered. How would that affect the good cause and standing arguments, or would it? I'm thinking it's practical to imagine that, because as medical expenses go, no way a hospital can run up $175,000 for an overnight visit when all you're talking about is birth control pills.  So if I understand the question, Your Honor, it's are there easy ways around, in other words, if you ordered insurance companies to do something or different states do something, are there ways around the existing requirement, to which I'd say the answer is yes. The Trump administration thinks that. The Obama administration thought that and said so in Zubik. They said it could be modified. As to whether any particular solution would or would not infringe on religious liberty, that's sort of a devil's-in-the-details type of question. The argument from the little sisters all along, and I think this is borne out actually by things both the federal government and the states have said, is, gosh, you're the United States government and you're the state of California. I think you guys can figure out how to get people contraceptives without involving nuns. It's not that hard. There are a lot of programs to do it. And so the sisters' answer would be, if you can leave me out of it, if you can leave us out of it, we don't object to other things you do that don't involve us and our insurance plan. And the reason the federal government had to admit that it would lose the RFRA claim is precisely that there are a ton of ways to get this done, and the State of California and the Federal Government of the United States don't need the little sisters of the poor to do it. Thank you, Your Honor. Thank you, Your Honor. The appellants have exceeded their time, but we appreciate very much all of the arguments from you. And we'll hear now from California. Good morning, Your Honors. May it please the Court, Carly Eisenberg on behalf of the Plaintiff States. Your Honors, I'd like to start out with a few factual corrections from what my colleagues on the other side said. Now, first, Zubik, the Supreme Court directive to the agencies, said that the agencies should come up with a process by which they can both accommodate religious employers, but while still ensuring women receive their contraceptive coverage. And after the Zubik decision, the agencies issued a request for information asking what can we do, but the starting point from the analysis from the agencies, from the very beginning of the contraceptive coverage requirement, has been women will always receive this statutorily entitled benefit. Hold on just a second right there. Yes. There's a question that's been of concern to me for a while on this case, and I'm sure you can help me. The basic premise of standing here is if the feds don't make the insurance companies pay, we will have to pay, and it will cost us money. And that's necessarily the basis for standing. And I'm not sure I understand just why the states have to provide contraceptives for women. It might be a nice thing to do. It might be the right thing to do. It might be the best policy to do it. Or maybe not. A state could take a contrary view. You could have a state that, for any number of reasons, might decide not to. If the states don't have to provide contraceptives for women who don't get the money someplace else, I don't think there'd be standing. So why does California have to provide the money for contraceptives for women if the insurance companies compelled by the feds don't? Your Honor, I understand your question to be getting at this idea sort of of self-inflicted harm, that the states are self-inflicting the harm. That's right, if you consider it a harm. Right. So, first, that argument had previously been made in the Fifth Circuit in the Texas v. United States case. And there, the Fifth Circuit said, if a state could always change its laws so that that would be avoiding the harm, then the state would never have standing. And indeed, the notion that- What's the matter with that? I mean, the women have standing if they're the ones who are directly affected. And I don't see what's the matter with the state not having standing. It seems circular, since what we're arguing about is whether the state has standing. Well, but these programs that the states operated had been in existence long before the federal government's interim final rules. So what? Well, let me just clarify it factually. Is it not the case that four out of the five plaintiff states have statutory mandates requiring this coverage? That's absolutely right, Judge Graber, except for those contraceptive equity laws don't reach the self-funded plans. So we, California, to the extent it can, has jurisdiction over those plans that it licenses, but it doesn't license federally controlled plans. So there's a proportion in each of the states that the state would have to cover under its existing law. That's absolutely right, Your Honor. And it's not an insignificant number. Does every state in the country have that kind of law? No, Your Honor. So why would you need a nationwide injunction to make the states that don't have that kind of law, don't want that kind of law, nevertheless act in accord with that sort of law? Right. Looking at the scope of injunction from the lens of an abuse of discretion, here it's very important to look at the record because I think this particular district judge was thoughtful and considerate because he looked both at what the government said in the brief and had a lengthy colloquy with the U.S. attorney. In the government's brief, they said if the court rules in plaintiff's favor, the court should return the parties, plural, to the position that they were in before the rules issued. Counsel, we recently had an in-bank case, and the name of it is escaping me at the moment, in which we reversed a nationwide injunction and said there have to be extensive factual findings to justify it. Why wouldn't we, assuming we get to that point in this case, why wouldn't we have to do the same thing here? So it's a number of factors, Your Honor. First, it was what was before the district court judge. And here, the government said, not only in their papers, but in the discussion with the judge, said if we lose, the right would result would be to return us to the world before October 6th, 2017. So the government didn't ask for anything but a nationwide injunction in the event that they lost. And additionally, Your Honor, here you're the situation is a facial challenge brought by five sovereign nations addressing a very narrow --- But they're not exactly nations. Excuse me. Right. I've heard that there's some interest in that. My apologies, Your Honor. Five sovereign states bringing forth a very narrow legal question with regard to notice and comment, and that very narrow legal question doesn't alter jurisdiction to jurisdiction. And here, where you have an -- when you're dealing both with health care and with these five sovereign states where residents work for employers outside of the state, they travel outside the state to work for an employer, and residents go outside of the state to go to universities. And so to ensure that those states receive the relief that they're entitled to -- That argument goes too far. I mean, that argument would say that California can impose its labor laws on people in New York. Some Californians travel to New York to work. Well, Your Honor, it's just -- it's looking through whether the district court abused its discretion with these facts before it. And here, when we're also talking about health care, and there's a lag time between enrollment periods, there's plans need to accommodate to adjust the plan depending on modifications and changes to it, there's cyclical enrollment periods, it's a bell that once rung cannot be unrung in terms of once the IFRs are implemented, it would be very difficult to undo. We had a case years ago involving a cross on Mount Soledad. And I think in our resolution of it, as I recall, we said any First Amendment violation is an emergency. And we allowed an injunction basically before the merits were resolved that required taking down the cross because it would be an emergency if people had to live with that cross in their state. Why would the same logic apply here? Your Honor, I -- The theory is First Amendment violation treated as an emergency. Now, I think that might have been pre-RIFRA, so the case would now actually be stronger. Well, if we're still talking about the scope of the nationwide injunction, in the context of the APA, this Court held in Northwest Environmental Defense Center that the courts in the APA context are courts of equity. And so their powers are broader, they're more flexible, that the courts in that context may and frequently do go much further than they would when there's public law at issue with states and federal government than if it were just two private parties with regard to that dispute. I think I understood Judge Kleinfeld's question differently, and if I didn't, it'll become my question, which is sort of on the merits of whether the good cause exception to notice and comment applies. And if not, why not? My apologies, Judge Kleinfeld and Judge Kraber. Good cause doesn't apply. As Your Honor indicated, good cause, this Court has held over and over again that it's to be used in emergency circumstances, calamitous, only when real harm would come. And this Court has said that the exception should not swallow the rule. Well, from the little sisters of the poor perspective, real harm would come. They'd be compelled to pay for contraceptives that they thought were contrary to their deeply held religious beliefs. Your Honor, the three statutory exceptions to good cause that Congress has crafted out in the statute is unnecessary, impracticable, and contrary to a public interest. And this Court has held that when there's a circuit split, a division of authority, and here, that's precisely what there was. There were nine circuits that had dealt with this issue as to whether or not the accommodation satisfied RFRA, and eight circuits found that it did, and one circuit did not. And this Court, on two separate occasions, has concluded that resolving a circuit split, resolving uncertainty, is not good cause. It held that in the Paulson case, and then Valverde said— That's what the fellows and women do upstairs. But maybe this is a good time to ask you to respond to the question I asked earlier. I wanted to find out if anybody could give me some assistance. No one has so far, but I suspect California must have an answer of whether or not we are required or should take another look at this circuit-wide proposition on the basis that the balance of equities have changed when California and all of the parties stipulated that they would not go forward with the trial and hold up maybe for a year, a year and a half to come up with an answer, and then requiring all the other circuits to follow that, even though we know that there is going to be more cases coming up pertaining to people that want an answer to their First Amendment rights. And I'm asking you, don't we have to take a re-look at this nationwide process on the basis the balance of equities have changed when all the parties would hold up the case for over a year when we have always said that it makes no difference what we say on a preliminary injunction. We're going to look at the final injunction. Right, Your Honor. And certainly this Court could consider that. But I do have a factual development. We just learned last week, and this may be the reason why the government at least entered into the stipulation. Every party entered into it, including California, I assume. Absolutely right, Your Honor. We did as well. But we just learned that last week the interim final rules are now pending before OMB, which is the last stop before the rule becomes published. And so it may be that, very well may be, that this appeal becomes moot if the rule becomes finalized. Now, admittedly, rules can't be changed. So I have a question about that. First of all, I would appreciate both parties submitting citations, if they have any, that demonstrate the fact that you just alluded to, because it would be a fact that it's subject to judicial notice. But if that is true, shouldn't we simply defer ruling on this case until we determine whether it's moot? Your Honor, that is an available option for the Court. I have no estimate on when the rule will become finalized. It does appear that sometimes rules sit at OMB for months at a time. So it may sit there for several months moving forward. But that is certainly an option available to the Court. I should say that I share, to a certain extent, Judge Wallace's frustration with appeals of preliminary injunctions, because the standard, I mean, they can be helpful to shape the legal issues in the case, but oftentimes it's better if there's the trial and the final answer from the district court. But the fact that the government stipulated could suggest that they see less urgency than their argument today states. I believe that's absolutely right, Judge Graber. I think that that's a reasonable inference, because it is one thing to be coming into court arguing that there's no irreparable harm in balancing the equities required moving forward, but then simultaneously staying the action, which would allow the parties to do discovery, to depose the declarants, to see whether or not they have the expertise that to challenge the declarations on the merits. Well, I'm not sure that fully answers my question. The State of California is well aware of our rule. We had a Second Circuit case on a panel I'm on now where people wanted to have a preliminary injunction, and then the State of California withdrew its objection on the basis that they wanted to get to the final decision because they knew the relief they could get was very temporary. So California is well aware of our situation. I just don't understand why California entered into the stipulation. It strikes me as changing the ballgame because the balance of equity is changing. What is your position on that? Yes, Your Honor. I believe, I mean, it was a — I conferred with my client, and we talked about the pros and cons of, you know, entering into the stipulation. And I'd prefer not to disclose the contents of that conversation with my client, but it did seem as though at the time, at the very least, that in discussing with opposing counsel what would be appropriate, and given that there is other litigation going forward, and I think this gets to your point, Judge Walz, with regard to percolation, that here, in this case, there is a lawsuit pending in the Third District Court of Appeal, where a nationwide injunction was entered before the injunction was entered in this case. But nevertheless, this case moved forward. There's a case in — that was started by Massachusetts, where the court reached the merits on summary judgment, and that is now on appeal. So there's been percolation. What was the answer in that case? There, the district court concluded that Massachusetts itself did not have standing, but the district court distinguished California and Pennsylvania and said, well, it made sense that they — those particular States had standing in their cases, but Massachusetts didn't meet its burden. And to Your Honor, Judge Walz's point, it was at the summary judgment stage, and there's different declarations that were supporting what Massachusetts had said with regard to standing, and the declarations here. But why did the court draw that distinction? What did they say about why California does and Massachusetts doesn't? They concluded that it seemed as though that — that based on the record that the Massachusetts judge had at that time, that there were, in fact, employers in California and Pennsylvania that would utilize the interim final rule. And the basis for that was they looked to the motion to intervene that was filed by Little Sisters of the Poor in this case, in which they say, we plan to take advantage of this rule, and we're located in California. And so Massachusetts said, well, someone who's not at the table here in Massachusetts is an intervener because Little Sisters of the Poor has — it's my understanding that they also have operations in Massachusetts, and they did not intervene there. So Massachusetts drew the conclusion that there were, in fact, entities that would utilize the rule in California. So — Kagan. Well, maybe that's a good reason for us to review at least that part of the injunction that puts in a nationwide — a nationwide stay. The Seventh Circuit has said it's a good idea. The Supreme Court has agreed to have more than one decision is a very good thing for the Supreme Court, which — which court will eventually make the decision. So maybe we should set aside that stay, that nationwide stay, in line of the actual admonition that we've already had from the Supreme Court. What would be your response to that? Your Honor, I think looking at whether the district court abused its discretion here and where the government hasn't pro-offered an alternative to a nationwide injunction, there may well be — it seems to me that there would be administrative difficulties and burdens for the government to impose anything less than a nationwide injunction where there's an accommodation and an exemption process in place with in the sovereign states. Well, that argument might have — I might have accepted that argument, except that you, the state of California, are going to delay the final determination, because the Supreme Court isn't going to care what we say about a preliminary. They will care what we say about a final injunction. And by entering into the stipulation, you've delayed that already 10 and a half months, and it'll be more than that before they're ready for the final decision. So can't we take a look and say, no, there's been actions in this case where we think that we should set it aside? That is, you brought it on yourself when you stipulated to hold this up for perhaps a year before the case gets out in its final determination and the Supreme Court takes a look at it. Well, Your Honor, this court — given that there are perhaps changed factual circumstances, the court could always remand and allow the district court to consider those changed circumstances in the first instance, since it wasn't given an opportunity to review — We could. We could. But maybe we have enough before us now to make the decision. The alternative would be what you indicated. Right. That's right. I think those are the two options before the court. And our — But, you know, any time we are holding things up, justice delayed is justice denied. And we have to be in consideration that we're talking about a First Amendment to the Constitution. So that must weigh on us, even in situations where we have to make tough decisions. I agree. But to Judge Graber's point, I do think that cuts both ways, given that all parties stipulated to stay the action. And it's my recollection that at least one of the defendant intervenors was also a party to that stipulation. Little Sisters of the Poor at that time had been granted intervenor status, and I believe they were also a party to the injunction — or the stay, excuse me — So no harm, no foul. So I guess my question is whether our — assuming that we don't defer for these additional developments, is our standard of review for the nationwide piece the same as our standard of review for the other portions of the preliminary injunction, that is, for abuse of discretion? Yes, Judge Graber. It's for abuse of discretion. But the standing and venue questions are legal questions. So by definition, if there's legal error, that is an abuse of discretion, right? That's correct, Your Honor. With regard to standing, however, to the extent that there are factual findings made by the district court, this Court can review those for clear error. And the Supreme Court has said with regard to the motion for a preliminary injunction, while the burden is normally no less than required at summary judgment, the plaintiff must set forth by affidavit the evidence for purpose of the motion will be taken as true. So here, to the extent that it appears the appellants are taking issue with the statements that are in the declarations, those statements — Well, the declarations seem a little bit wishy-washy, for want of a better term. They're not as definitive as we often see in support of standing. And I guess I'd like your best argument in summary form of why the states have standing by reason of fiscal impact. Right, Your Honor. Well, both, as Your Honor pointed out, there are concessions by the government that the individuals will turn to state-funded plans. And additionally, the declarations from insurance commissioners, directors of health plans, from Planned Parenthoods, and from Guttmacher experts in this area have concluded that, for instance, the Director Rattay from Delaware said, I predict that if the IFRs are enforced, more women will lose access and will seek access to the — will obtain those services through Delaware's programs. And we know with regard to the numbers that 1.5 million women in the plaintiff's states are covered by a self-funded plan and would be eligible for a state-funded program. So it is big numbers that we're looking at. And here, standing with regard to a procedural injury, the plaintiff need demonstrate only that there's a reasonable probability that there — a reasonable probability that the challenged action threatens the concrete interest. And that comes from Judge Kleinfeld's decision in Friends of Santa Clara River, issued just earlier this year. And indeed, in Sierra Forest and Cottonwood, this Court has found that an individual plaintiff need not point to a site-specific location or a project-specific implementation of the rule. They can — the plaintiff can challenge the nationwide rule before it takes effect. And in Sierra Forest, what's interesting is the plaintiff there was actually the State of California. And this Court held, well, California has a concrete interest spanning its entire territory, and it unquestionably has a well-founded desire to protect its proprietary interests. I'm worried — I'm worried about the problem of bootstrapping oneself into standing. I thought in other contexts it was established, but maybe I'm wrong, that you couldn't bootstrap yourself into standing by entering into a contract for some other arrangement by which you would be bound to pay money. Well, here, the programs have been in existence before the interim final rule, and they're available to all residents of the State. And so that a woman would seek out one of the programs, would avail herself to it, doesn't turn California's injury into a self-inflicted harm when they're challenging the issuance of the interim final rules that affect the programs that were in place prior to that. And additionally, Your Honors, this Court has — in Imperial County is a helpful case because there's a government there, the county — On that — on that first proposition, you said that other courts have said that a State can, in effect, bootstrap itself into standing. And I didn't write down which circuits and cases. Oh, I'm sorry, Your Honor. I didn't — I don't believe I referenced another circuit case with regard to bootstrapping standing. I was referencing this Court's standing requirements with regard to a procedural injury, what the — what the test is for an individual plaintiff. Thanks. In Imperial County, Your Honor, the county wasn't the direct object of the government's action, but nevertheless, this Court concluded that the county had standing because of the risks that would come as a result of the Federal government's rule. So there, because of the rule, there was a risk of increased dust in the air, which would risk a possible Federal enforcement action, which would risk a loss of highway funds. And this Court held that those were sufficient risks to show a threat to the county's concrete interests. And so here, that's what the State has done by way of its evidence. It has shown that there is a reasonable probability that there are risks to California's concrete interests by way of their public fisc. Maybe you can give me some help. At the time the stipulation came to the District Court, did the District Court hold a hearing to get additional evidence, or did the District Court just sign — sign off on the stipulated stay? Your Honor, the Court signed off on the stipulated stay. There was no — So sending it back won't do much help. The District Court has done nothing in the record that would help. Why can't we just go ahead and make the decision now as to whether or not the balance of equity is changed because of that and make our decision? Well, certainly this Court could consider that, but this Court reviews that — that's only one piece of the injunction puzzle. The Court still reviews the injunction for abuse of discretion and would have to look at both whether the State's likely to succeed on the merits and the irreparable harm piece. So even if this Court considered that, and as I mentioned, it does appear it would cut both ways given that the appellants have signed on as well, that doesn't wholly make the injunction reversible. Help me on another thing. But I'm talking about just that part of the injunction, having in mind that the nature of what it — of that stipulation was at least a year delay before people all over the United States find out what their rights are under the First Amendment. Wouldn't that be a consideration? Yes, Your Honor. I think that it would be a consideration that this Court could take into account. And then I suppose that the District Court did not take into consideration the Mendoza Supreme Court direction that they would prefer to have several decisions made in cases which was never presented to them because there was never any argument. She just signed off on the stipulation. With regard to the parties staying the action, Your Honor? Yes. It seems to me it's contrary to what the Supreme Court's told us in Mendoza, that they'd prefer to have multiple decisions made so they can make a final determination. Right. I think that here, however, there have been multiple decisions, as I mentioned, that have been made on this particular issue, some at the summary judgment stage, some at the preliminary injunction stage, and that the parties enter into a stipulation and the Court signed off on it without a hearing. I'm unaware of any authority that that in and of itself is reversible. Counsel, let me ask you about another aspect that's bothering me here. The crux of this case is procedural injury issuing the interim rule without notice and comment. What comment could California add that the agency has simply not thought of because it didn't have the benefit of California's comments? It seems to me usually when we get those, people can say, well, we would have talked about this and that. But in this case, there have been, I think, hundreds of thousands of comments, of great national debates spanning years. I'm trying to imagine what California could add to that. So tell me. So sort of two pieces to that. Well, with regard to standing, and then I'll turn to good cause, but with regard to standing, the state need not demonstrate that had the agencies complied with the rules, there would be a different outcome. It needs to only show that it's possible. And here But in evaluating the harm and the need for the injunction under the four-part test and so forth, it would matter. Well, under Your Honor's decision in Friends of Santa Clara River, the court redressability and causation are relaxed because this court, the only time this court had, excuse me, this court in Your Honor's decision pointed out when there wouldn't be redressability, when the agency comes to a final conclusion, when it's something like a treaty that no matter what comments you receive, you can't change what the agency would have done. And that's why the standard is, could they have come to a different conclusion? And here, given No, no, that's not what I'm asking. Sure, they could have, except for if there's a statutory or constitutional restraint that would prevent it. What I'm asking is, your procedural injury is you didn't get a chance to be heard. But what could you say that would add to what the agency already knew? Well, numerous things, Your Honor. First, there are two rules. One is a moral rule, and that has never been proposed by the agency in all these years. It was entirely new to the public that the agency was going to now have a moral exemption. With regard to the religious exemption, the court or excuse me, the HHS expanded the exemption. And the import of that is that under the accommodation, there's the accommodation and the exemption. Under the accommodation, employees still receive their health care coverage, but employers can opt out. And by opting out, they are completely divorced from providing that particular coverage. But allowing employers to obtain the exemption, the employees now no longer receive their health care benefits that they're entitled to by statute. And here, any employer can seek an exemption. And particularly problematic is that there's no notice requirement to the government. And even Paul Clement, who argued Hobby Lobby in front of the Supreme Court, said, well, the reason that we know no one will take advantage of this particular accommodation process is the government can always challenge the sincerity of the employer's beliefs. Well, that assumes that the government knows who is opting out. And here, there's no requirement that they either submit a letter or a form. And so certainly, those are only some aspects of the rules that had the agencies engaged with the public, had a pre-publication dialogue before the rules are chiseled into bureaucratic stone that would allow the public to have their voices heard on these very important issues, which we know from the comments that entities care about. I see I'm out of my time. You are, as are appellants. They used more than their time as well. We are very appreciative of the arguments of all counsel in this very challenging case, which is now submitted. And we will be adjourned for this morning's session.
judges: Wallace, Kleinfeld, Graber